UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

J. P. BRENTWOOD CLIVEDEN,

    Plaintiff,

v.

CDM CLINICAL DATA MANAGEMENT
DEUTSCHLAND GmbH f/k/a/ TEAMWORKS
COMMUNICATION SYSTEMS GmbH,
CDM CLINICAL DATA MANAGEMENT UK LTD,
f/k/a TEAMWORKS CLINICAL SERVICES LTD,
TEAMWORKS CLINICAL SOLUTIONS, LTD,
TEAMWORKS CLINICAL SERVICES, INC.,
TEAMWORKS CLINICAL SOLUTIONS
INTERNATIONAL, INC., TEAMWORKS CLINICAL
SOLUTIONS PRIVATE LTD, and DR. THOMAS
HEINA,

    Defendants,

and

MERCK & CO., INC.,

    Reach and Apply Defendant.

CIVIL ACTION NO. 04 11903 JLT

**MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR
PRELIMINARY INJUNCTION IN AID OF A REACH AND APPLY ATTACHMENT**

**Introduction**

Plaintiff J.P. Brentwood Cliveden ("Cliveden") submits this memorandum of law in support of his application for a preliminary injunction. In his application Cliveden asks this Court to order reach-and-apply defendant Merck & Co. ("Merck"), party to a licensing agreement with one of the defendants,[1] to withhold up to $400,000, owed to such defendant or

---

[1] Counsel for Cliveden has been seeking a copy of this contract since September, 2004. The contract has not yet been produced and Cliveden thus is still unable to confirm with which entity with whom Merck has contracted.

to any other entity in which defendant Dr. Thomas Heina ("Heina") has an ownership interest or which he controls.

Cliveden, a Boston resident, is owed in excess of $400,000 by defendants, a group of companies collectively referred to as "TEAMworks" and Heina, their founder including: (i) fourteen (14) months of unpaid salary at the rate of $14,000/month, (ii) un-reimbursed business expenses in the amount of $167,530.42 incurred exclusively on defendants' behalf, (iii) damages in the form of lost compensation arising from his discharge after defendant Heina learned he filed an affidavit in support of another employee's claim for unpaid wages (a claim which Heina eventually paid); (iv) damages, *inter alia*, to his credit rating as a result of living expenses and office expenses he had to advance on TEAMworks' behalf. Cliveden has a reasonable likelihood of recovering judgment, including interest and costs, equal or greater than $400,000, the amount sought to be attached through this application for injunctive relief. If the injunction does not issue, it will be difficult, and perhaps impossible, for Cliveden to collect on a judgment against the defendants. Already three of the foreign defendants – notably, the ones with assets – have moved to dismiss on the grounds of lack of jurisdiction. Even if they remain in the case, Cliveden will have to chase them abroad to recover the funds. The defendants who have not moved to dismiss include (i) Heina, a German citizen now a Singapore resident, (ii) two TEAMworks New-Jersey based companies that are in reality a virtual corporations with no assets, and (iii) a German company whose operations have largely been relocated to Singapore when Heina moved there. As described in Cliveden's opposition, dated January 3, 2005, to the motion to dismiss filed by three of the defendants, as well as in this memorandum, there are so many TEAMworks' related entities that Heina, who owns and controls them, can transfer and, in fact, has transferred money from one to the other, thus enabling the companies to evade

2

judgment and other creditors. For these reasons, and those discussed below, Cliveden asks this Court to enter the requested injunction.

### Facts Relevant to the Application for Injunctive Relief

This action arises out of Cliveden's employment by defendant Dr. Thomas Heina ("Heina") and a group of inter-related companies all referred to by Heina and others as "TEAMworks."(Complaint, [2] Affidavit of J.P. Brentwood Cliveden in Support of Application for Preliminary Injunction (hereinafter "Cliveden PI Aff.", ¶ 3). Cliveden seeks damages under breach of contract, action in reliance, unjust enrichment and termination of employment in violation of public policy. (Complaint, ¶1.)

The relationship between Cliveden and the TEAMworks companies began in May 2000, when Heina induced Cliveden, who was then working at IBM, to work for TEAMworks. TEAMworks is engaged in the business of providing technical support, training, and implementation services and of licensing its own specialized software to the pharmaceutical industry to assist in bringing products to market. (Complaint, ¶18; Cliveden PI Aff., ¶ 3.) During the course of those initial discussions and thereafter, Heina did not differentiate among the German-based company, then called TEAMworks Communication Systems GmbH (later renamed CDM Clinical Data Management Deutschland GmbH), the US company (called, from time to time TEAMworks Information Systems or TEAMworks Clinical Services), which then had a mailing address in Palo Alto, CA, but no employees or assets, or any of the other extant Heina-related companies all called by the name of TEAMworks with various suffixes. (Cliveden PI Aff., ¶ 4, and Exhibit K-1, Exhibit K-3 and Exhibit U).

Heina offered Cliveden a position of employment at TEAMworks. On May 31, 2000, Cliveden wrote to Heina, "I am very honored by your offer of employment in a position of such

---
[2] Cliveden has verified the allegations in the complaint through his affidavit, Cliveden PI Aff., ¶3).

responsibility for TEAMworks in establishing North American operations." (Cliveden PI Aff, ¶5 and Exhibit A). He simultaneously informed Heina that he was exploring his career options at IBM and other job opportunities. Id. On June 21, 2000, Cliveden informed Heina of his other potential business opportunities, including a position at IBM and twenty qualified job possibilities from companies ranging in size from Sun Microsystems and Ernst & Young to smaller start-up ventures. He told Heina that, to accept an offer at TEAMworks, he needed compensation comparable to what he would be forfeiting by leaving IBM, including health, dental and other insurance, a pension fund, the ability to save for retirement and other benefits. (Complaint, ¶ 19; Cliveden PI Aff., ¶6 and Exhibit B). Heina responded, "if we would provide you a letter from the GmbH in Germany immediately confirming that we will provide you an employment contract under US law latest by August (if possible, but this depends a bit on the lawyers as well, by August 1st) similar to our standard UK one . . . would this provide a basis for you to resign from IBM and confirm August 1st as your start date?" Heina enclosed the British standard contract outlining the terms of the job, and represented that the US contract would be comparable. Id. Again, he did not differentiate between the German and US entity or the other foreign entities. Instead, in his e-mail, Heina wrote, "the whole TEAM feels very pleased that you will join TEAMworks!!![sic]" (Cliveden PI Aff, ¶6 and Exhibit B.)

Heina continued to press Cliveden to work for TEAMworks, urging him to take the "next steps." (Cliveden PI Aff., ¶7 and Exhibit C.) As a further inducement to Cliveden to join the "TEAM," Heina recruited Cliveden's colleague at IBM, Douglas Bain .(Cliveden PI Aff., ¶7 and Exhibit D; Affidavit of Douglas Bain ("Bain Aff."), ¶2). On July 25, 2000, after several telephone calls and e-mail correspondence, Cliveden agreed to resign IBM as soon as he and Heina worked out the details of the TEAMworks offer. (Cliveden PI Aff., ¶8 and Exhibit E.)

Heina and Cliveden spoke shortly thereafter. Heina confirmed that until a company was formally incorporated in Boston (which he represented he would do promptly), Cliveden's salary would consist of $160,000 annually, reimbursement of the employer's share of Social Security, reimbursement of the cost of purchasing life, health and disability insurance policies and a pension plan equivalent. After the Boston company was set up, it was anticipated that the company would deduct the taxes and pay the benefits directly. Id. Heina also confirmed that all of Cliveden's expenses in setting up the Boston-based company and all travel and other expenses related to the establishment of TEAMworks in the Boston and company-related business would be reimbursed. By August 3, 2000 after an exchange of e-mails and a telephone call, the parties agreed upon terms to the point where Heina was asking for Cliveden's address to be included in the contract. (Cliveden PI Aff., ¶9 and Exhibit F.)

In reliance on these promises, memorialized by the draft contract and follow up e-mails and phone calls, Cliveden resigned from IBM and commenced employment with TEAMworks on August 22, 2000, as a company director, Director of Sales, US, and the Vice President and General Manager of the US office. (Cliveden PI Aff., ¶10) He did not receive the employment contract at that time, but Heina repeatedly promised it would be forthcoming. Id.

Promptly upon commencing employment, Cliveden leveraged his former customers and professional contacts on TEAMworks' behalf and set up meetings to market TEAMworks' products and services. He met with prospects on TEAMworks' behalf in the UK, Germany, Switzerland, the Netherlands, Canada, and in numerous locales in the United States (Complaint, ¶ 23; Cliveden PI Aff., ¶ 2). Cliveden also set up the TEAMworks' headquarters in Boston and began incurring expenses on behalf of TEAMworks, including travel, hardware and software purchases, registrations at trade shows, telecommunications charges, the rent on the Boston

5

headquarters and other incidental expenses. (Cliveden PI Aff., ¶ 11 and Exhibit H).  In what, in retrospect, Cliveden might have seen as a warning, the bank would not honor Heina's company charge card, when Heina's assistant Maita Jensen attempted to use it for Cliveden.  Heina professed confusion over the dishonor of his card, offering several excuses (Id. and Exhibit G). At Heina's request, Cliveden thereafter started charging all TEAMworks expenses to his personal charge card, even including the expenses of other office staff.  (Id. and Exhibit H.) These charges were made at Heina's authorization and with promises and expectations of reimbursement.  (Cliveden PI Aff., ¶ 11).

Initially, through TEAMworks' bank accounts, including its bank account in the UK, Heina reimbursed Cliveden's expenses and paid salary, by wire transfer, within one or two months.  Shortly thereafter, payments fell behind.  As set forth in the detailed expense summary attached to Cliveden's affidavit, Heina and TEAMworks now owe Cliveden $167,530.42 in expenses alone and $196,000 in unpaid salary. (Cliveden PI Aff. ¶ 13-14, Exhibit H and Exhibit J).  All of these expenses are supported by individual detailed Expense Reports – 269 in all. Samples of the expense reports are attached as Exhibit I to Mr. Cliveden's affidavit.

The Expense Report Summary and salary payment chart (Cliveden PI Aff., Exhibits H and J) show that Cliveden received from TEAMworks monthly salary payments and expense reimbursement for about a year, albeit always late.  The expense reimbursement included business travel expenses, finance charges on credit cards as a result of late reimbursement, the cost of disability insurance, the employer's share of Social Security, postage, office supplies, life insurance reimbursements, a pension equivalent, substantial telecommunication charges, hardware, software, the expenses of other employees and other miscellaneous business expenses. Heina's last payment of salary was wired from a TEAMworks account in the UK on May 27,

6

2002, representing a monthly salary payment for the month of December 2001 – 6 months late. (Cliveden PI Aff., ¶15 and Exhibit K-6).

Because Cliveden was unaware of his rights as an employee, because of his loyalties to TEAMworks, to Heina and to the product itself, and because of repeated promises of special bonuses for his patience, Cliveden accepted the late payments. (Complaint, ¶27, Cliveden PI Aff., ¶3). Although Heina was in essence forcing him to work without pay and without prompt reimbursement of the expenses he advanced on behalf of TEAMworks while simultaneously assuring him payment would be forthcoming upon payments from customers, Cliveden continued to market the product, run the US based operations, participate in presentations and trade shows, pursue contracts on TEAMworks behalf, draft proposals, and communicate with clients and prospects, traveling frequently and incurring further expenses on the Company's behalf, all as reflected in part on his expense reports. He worked long hours, often without break, in the United States, Canada, and in Europe. (Complaint, ¶29.) Each time Cliveden reminded Heina that his salary and expense payments were overdue, Heina repeatedly represented to Cliveden that TEAMworks was experiencing short term financial difficulties but that Cliveden would be paid his salary and reimbursed his expenses as soon as TEAMworks received payments from customers. In fact, Heina represented that Cliveden would be paid a bonus for his patience and loyalty. (Complaint, ¶30.) In an e-mail (attached to the Cliveden's Affidavit in Opposition to the Motion to Dismiss ("Cliveden Opp. Aff."), Heina even assured Cliveden, in October, 2002, that any money received from Genzyme Corporation were funds belonging to Cliveden. (Cliveden Opp. Aff., Exhibit B.) However, no such funds were ever paid to Cliveden.

Cliveden was not the only employee to suffer. Eight former employees have submitted affidavits on his behalf, attesting to TEAMworks' widespread violations of the labor laws of the various jurisdictions where Heina set up business entities, the failure to pay salary, expenses and mandatory pension benefits, and the lawsuits commenced against Heina and his companies, including by oversight agencies, in Germany, Singapore and the UK, among other jurisdictions, for nonpayment of wages, pensions, and expenses. *(See* Bain Aff., affidavits of Douglas Beauregard ("Beauregard Aff."), Elizabeth Wills ("Wills Aff."), Lance Eminger ("Eminger Aff."), Anders Krogh ("Krogh Aff."), Jeremy Smethurst ("Smethurst Aff.") and Bruce Sharp ("Sharp Aff.") all submitted herewith and affidavit of Roger Holden ("Holden Aff.") previously submitted in support of Cliveden's opposition to the motion of three of the defendants to dismiss on jurisdictional grounds.)   Cliveden also has submitted a notice from another foreign employee, Maita Jensen, who was so weary of Heina's refusal to pay her, allegedly because of "difficult financial times," that she refused to complete a year end project or perform further work. (Cliveden PI Aff., ¶23 and Exhibit T).

The affidavits submitted in support of this application for a preliminary injunction describe the constant financial issues plaguing the office, the irate vendors and contractors, and the several companies and individuals who were forced to initiate legal action to receive payment for material provided or services rendered. (Holden Aff., ¶¶7-8; Wills Aff., ¶4)  Indeed, several employees tendered their resignations from TEAMworks because of the continued delinquency of their own salaries as well as those of their subordinates, which decreased productivity and created a demoralized work ethic (*See* Beauregard and Smethurst affidavits).  Jeremy Smethurst, whose resignation letter is attached to his affidavit, cited repeated delays in salary, repeated delays in reimbursement and repeated delays in pension contributions despite deductions of same

from his paycheck. Lance Eminger, a Singapore Managing Director, who was summarily dismissed when Heina and his girlfriend moved to Singapore, observed, "I found Dr. Heina to be focused more on ways to take money from his employees, defend against claims or seek out retribution on former employees that he felt wronged him, than he did generating new business or encouraging his employees' careers." (Eminger Aff., ¶7).

Cliveden believes, and the affidavits bear out, that Heina, who himself was spending money derived from the TEAMworks contracts on expensive cars, horses, vacations, and other luxuries, prolonged Cliveden's payments the longest of any other employee, because the labor laws of the various other countries in which he did business – the UK, Germany, Switzerland, the Netherlands, Singapore, and the Philippines, for instance – would have subjected him and his corporate entities to strict penalties and fines. (Complaint, ¶30; *see also* Smethurst affidavit (threatening legal action through the Scottish Employment Tribunal); Eminger affidavit (attesting to summonses issued by the Central Provident Fund of Singapore in regard to non-payments)). By delaying and eventually abandoning formal incorporation of a TEAMworks entity in Boston, Heina avoided the imposition of state and federal labor laws to his failure to pay and reimburse Cliveden.

Cliveden initially filed an action for nonpayment against defendants in the Employment Tribunal in the UK, until, after consultation with counsel, he withdrew the claim to pursue an action in the United States. (Cliveden PI Aff., ¶16.) The defendants took the position in that action, as presumably they will here, that Cliveden was not an employee and, incredibly, that they owed him nothing for the period January 1, 2002 through March 2, 2003 notwithstanding their knowledge that he was working and paying expenses on their behalf and assurances of payment, including from funds to be received after October 2002 from Genzyme Corporation Id.

9

But the parties' course of dealing detailed here and reflected in the documentation and the affidavits of eight other former employees make clear that Cliveden was regarded by Heina and "the TEAM" as an employee continuously from August 2000 through March 2, 2003, the date of Heina purported to fire Cliveden (discussed infra).

As each one of the affiants attests, Cliveden was treated as a salaried employee and known to them as the Vice President and General Manager, North America, throughout the period for which he is seeking unpaid compensation and expenses. (Bain Aff., ¶2, Beauregard Aff., ¶2, Wills, Aff., ¶¶ 2-3, Eminger, Aff., ¶6, Krogh Aff., ¶2, Smethurst Aff., ¶¶5-6, Sharp Aff., ¶2, Holden Aff., ¶¶25). Cliveden was given business cards with the TEAMworks logo, he was listed on the brochures of the TRIALlink software as "VP, General Manager, North America," he appeared on company contact lists and birthday lists, he was certified as an "employee" trainer, and he was repeatedly referred to as part of the "TEAM" and included in e-mails as such, including e-mails sent by Heina. (Cliveden PI Aff., ¶17 and Exhibits K 1 through 8). He made presentations, including with Heina, as the "VP General Manager, US" and was listed on the organizational chart of TEAMworks Clinical Services as Douglas Beauregard's direct report (Cliveden PI Aff., Exhibit 8). The sale literature of the company software known as TRIALink and corporate websites of TEAMworks provided Cliveden's contact information. (Holden Aff., ¶4). Other employees attest to Cliveden's activities for which he was never compensated, including completions of RFI and RFP documentation for Merck, Johnson & Johnson and others, managing the US helpdesk, project management for US client projects and development of skills and knowledge transfer materials. *(See., e.g.,* Smethurst Aff., ¶6). Heina, who belatedly disavows an employment relationship, filled out a Request for Verification of Employment on Cliveden's behalf in January 2001, verifying Cliveden's employment as Vice President US

Operations and confirming that likelihood of continued employment as "long term." (Cliveden PI Aff., ¶ 17 and Exhibit L).

At no time did Heina require Cliveden (or anyone else) to fill out timesheets or otherwise account hourly or formally for their time (as he purported to do when Cliveden demanded his back pay and expenses in 2003). (Cliveden, Aff., ¶ 18 and Exhibit R, Beauregard Aff., ¶ 15). Cliveden kept Heina informed and corresponded with him frequently regarding prospects, trade shows, registrations, presentations to customers, customer contacts, and customer support and he participated in numerous meetings and teleconferences among TEAMworks staff in Europe, the UK, Asia and elsewhere. Indeed the expense reports reflect his meetings with customers and prospects, the substantial telephone bills paid on TEAMworks' behalf contacting prospects, customers and the overseas staff and his overseas travel expenses attending meetings with TEAMworks in the UK and Germany and the US consistently during the period for which he seeks back payments of salary and his un-reimbursed business expenses. His efforts on behalf of the TEAMworks affiliates in the US and overseas resulted in lucrative contracts between TEAMworks, on the one hand, and, on the other, pharmaceutical and biotechnology companies, including, but not limited to Genzyme Corporation, ZymoGenetics, Alliance Pharma and Merck. (Cliveden PI Aff., ¶ 18)

Heina repeatedly promised Cliveden a more formal employment contract and that he would incorporate a TEAMworks entity formally in Boston. On December 10, 2001, for instance, after Cliveden had been working for TEAMworks for about sixteen months without the promised final contract, Heina asked him to retain for TEAMworks a law firm in Boston so he could "register TEAMworks Clinical Services Corp. in Boston ASAP and also [to] establish formal contracts between you and TEAMworks which is due since (too) long" [sic] (Cliveden PI

Aff, ¶ 19 and Exhibit M). Cliveden did, in fact, arrange for the retention of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo P.C. ("Mintz") for both purposes and met with the firm. Heina participated in the first meeting by conference call and Cliveden participated in person. In December 2002, without ever forwarding to Cliveden for review the contract Mintz apparently prepared over a year prior (as indicated by the bill), Heina asked Cliveden to meet with him in NY to "get our staff sorted out." (Cliveden PI Aff., ¶ 20 and Exhibit O). These activities, as with all the others described herein, show a consistent and long term employment relationship between Cliveden and TEAMworks with promises by Heina of a formal employment contract, which he engaged Mintz to draft.

It was not until March 2, 2003, when Heina, by e-mail, purported for the first time to terminate Cliveden's relationship with TEAMworks. (Cliveden PI Aff, ¶ 21 and Exhibit P). The timing of the discharge makes it irrefutable that Heina terminated Cliveden's employment in response to Cliveden's recent pleas for payment of salary and expenses he was rightly due (Cliveden PI Aff, ¶ 21 and Exhibit Q) and shortly after he learned that Cliveden submitted an affidavit in support of a lawsuit initiated by fellow employee Bruce Sharp for failure to pay salary (Cliveden PI Aff., ¶ 21 and Exhibit R; Sharp Aff., ¶3). The termination immediately followed Mintz's threat, on Heina's behalf, that Cliveden sign an affidavit swearing, falsely, among other things, that he had no authority to act for TEAMworks in the US. (Cliveden PI Aff., ¶21 and Exhibit S.). Remarkably, this threat was made after a number of contacts between Mintz where the firm addressed Cliveden as Vice President and General Manager and corresponded with him at the company's U.S. address at 28 State Street, in Boston. Cliveden wrote to Rob Duggan of Mintz that he was "astonished" by the position taken by the firm and its client. (Cliveden PI Aff.,¶ 21 and Exhibit S). He reminded Mr. Duggan of their first meeting in

2001, and commented, "Had either you or Tom [Heina] any concern as regards my business relationship with TEAMworks in the US, it would surely have been appropriate to raise those concerns during the course of that meeting." (Id.) Cliveden refused to sign the affidavit containing false averments. Heina (consistent with Eminger's observation that Heina seeks retribution against employees he feels have wronged him) fired Cliveden and has refused to pay him anything.

### The Ever-Changing TEAMworks Entities

In this action, Cliveden has named entities with the TEAMworks name. He did so because Heina appears to have dissolved, renamed and reconstituted companies on a number of different occasions. For instance, the German company, formerly TEAMworks Communication Systems GmbH was renamed CDM Clinical Data Management Deutschland at the same address, but mailings to that address have been returned. (Cliveden PI Aff., ¶23 and Exhibit U). There appear to be three companies at the same address in the UK. There are now 11 TEAMworks-related entities, many of which are simply virtual offices with a mailing address and a recorded voice mail message, and all of which are interrelated and, in essence, vehicles set up for the benefit of defendant Heina. In addition to these entities, there are TEAMworks trade names used by Heina for the companies. Cliveden has identified the following TEAMworks-related entities. (Cliveden PI Aff., ¶23 and Exhibit U.)

**Germany:**

TEAMworks Communication Systems GmbH (Incorporation date: DEC 1997) (Directors: Thomas Heina, Martina Heina, Henning Lux)
1. TEAMworks Information Systems Gesellschaft für internetbasierte Datenverarbeitungssysteme mbH (Incorporation date: 31 MAR 2003) (Director: Heina)
2. CDM Clinical Data Management Deutschland GmbH f/k/a TEAMworks Communication Systems GmbH (change of name: 31 MAR 2004) (Director: Heina)

**United Kingdom:**
3. TEAMworks Clinical Services Ltd (Incorporation date: 22 NOV 1999) (Director: Heina)
4. TEAMworks Clinical Solutions Ltd (Incorporation date: 21 JAN 2004) (Director: Heina)

13

**5.** CDM Clinical Data Management Ltd f/k/a TEAMworks Clinical Services Ltd. (Change of name: 4 JUN 2004) (Director: Heina)

**United States:**
6. TEAMworks Information Systems Inc (name used but never incorporated in 2000) (Director: Heina)
7. TEAMworks Clinical Services Inc (Heina had planned to incorporate under this name in 2001/2002, but apparently did not)
8. TEAMworks Clinical Solutions Inc (Incorporation date: December 11, 2002) (Director: Heina)
9. TEAMworks Clinical Solutions International Inc (Incorporation date: December 11, 2002) (Director: Heina)

**Switzerland:**
10. TEAMworks Clinical Services AG (Incorporation date: 2000) (Director: Heina)
11. TEAMworks Clinical Solutions AG (Incorporation date: 17 MAY 2004) (Directors: Heina and Tanja Rüttimann)

**Singapore:**
12. TEAMworks Information Systems PTE Ltd (Incorporation date: 22 MAR 2000) (Directors: Heina and Anna Higgins--added in 2003) (Shareholder: 100% TEAMworks Communication Systems GmbH, Hanover, Germany)
13. TEAMworks Clinical Services PTE Ltd (Incorporation date: 27 Apr 2000) (Directors: Heina and Anna Higgins--added in 2003) (Shareholder: 100% TEAMworks Communication Systems GmbH, Hanover, Germany)
14. TEAMworks Clinical Solutions Private Ltd (Incorporation date: 16 DEC 2003) (Directors: Heina, Knut Unger (lawyer), and Anna Higgins--added in 2004).

Defendant TEAMworks Clinical Services Inc., a Delaware corporation with a principal place of business in New Jersey, and the entity that may hold the contract with Merck, appears to be the successor in name and interest to TEAMworks Information Systems, Inc., the US based entity for which Cliveden was working. The inter-relationship and intermingling of these companies is detailed more explicitly in Cliveden's opposition filed on January 3, 2005, to the motion of three of the defendants to dismiss on jurisdictional grounds and is incorporated herein by reference.

The only real asset of any of these companies is the software TRIALlink and it is not clear which company currently "owns" the software. (Cliveden PI Aff., ¶24). The company has entered Merck contract is believed to be worth $12 million. (Complaint, ¶ 53; Merck Answer to the Complaint, ¶60).

## ARGUMENT

Under Fed. R. Civ. P. 64 and Fed R. Civ. P. 65, the federal court may apply provisional remedies available under state law for prejudgment relief, including a preliminary injunction to restrain disposition of assets so that they may be reached and applied to satisfy a judgment under M. G. L. c. 214, §3 (6)." Anderson Foreign Motors, Inc. v. New England Toyota Distributor, Inc., 475 F. Supp. 973, 977-8 (D. Mass. 1979) (reach-and-apply remedies under M G. L. c. 214, §3 (7) available); Aylward v. Lawrence Sav. Bank (In re Osgood), 203 B. R. 865, 869 (Bankr. D. Mass. 1997). The reach- and-apply statute is a remedy in the nature of a writ of attachment. Anderson Foreign Motors, Inc. v. New England Toyota Distributor, Inc., 475 F. Supp. at 978.; In re Osgood, 203 B R. at 869. The conditions for obtaining such a writ are set forth in Mass.R.Civ.P. 4.1 (c), which require only that the plaintiff show "a reasonable likelihood that he will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the attachment over and above any liability insurance shown by the defendant to be available to satisfy the judgment. Anderson Foreign Motors, Inc. v. New England Toyota Distributor, Inc., 475 F. Supp. at 978 (quoting rule). Because the motion for a preliminary injunction under the reach- and-apply statute, is in the nature of an equitable lien or attachment, the court does not require a showing of irreparable injury or a favorable balance of harms. Id; See also discussion in In re Osgood, 203 B R. at 869-70. Although such a showing is not required, Cliveden is prepared, as a precaution, not only to show that he will likely recover judgment in the amount he seeks to reach and apply, but also that the harm to him without the issuance of the injunction is irreparable and far outweighs any harm to the defendants. See Johnson et al v. Koplovsky Foods, Inc. et al, 5 F. Supp. 2d 48, 51 (D. Mass. 1998) (appearing to apply traditional preliminary injunction standards to a reach-and-apply attachment).

A.     Cliveden is Likely to Recover Judgment, including Interest and Costs, Of at Least $400,000, The Amount Sought to Be Restrained from Payment

Cliveden has established through his complaint, which he has verified by affidavit, the averments in his affidavit and the exhibits attached thereto that he was promised employment by Heina including a monthly salary of $14,000, reimbursement of all business expenses incurred on TEAMworks' behalf, and the equivalent, through reimbursement, reimbursement of the employer's share of Social Security, reimbursement of the cost of purchasing life, health and disability insurance policies and a pension plan equivalent until Heina incorporated the company in the United States. He has also shown that for a period of time, TEAMworks made such payments, albeit always late, until Heina simply stopped making payments, asserting short-term financial issues. Eight other former TEAMworks employees from around the world have supported Cliveden's claim that he was steadily employed from August 2000 through March 2003. These employees, through affidavits, also show that Cliveden's situation was endemic to the TEAMworks entities and that many other employees similarly had to file lawsuits to recover substantial payments owed to them, as have independent contractors and vendors. Many of the exhibits to Cliveden's affidavit include admissions by Heina that Cliveden was an employee and show a steady communication with him as part of the TEAM. As late of December 2002, Heina was contacting Cliveden to set up a meeting in New York to "get staff sorted out." It was not until March 2, 2003, that Heina wrote, "Herewith I terminate any existing business relationship between yourself and TEAMworks Communications Systems GmbH, including any TEAMworks affiliate." Thus Cliveden is entitled, whether under a breach of contract, action in reliance or unjust enrichment theory, to be paid, at least through the purported termination date, what he was promised, what he earned through his continued work for TEAMworks and incurrence of business expenses behalf of this group of companies and what he forfeited by

resigning from IBM and forfeiting other business opportunities to join TEAMworks. Because the evidence demonstrates that Heina terminated his relationship with TEAMworks for his refusal to give false testimony, Cliveden is entitled to additional damages, beyond the purported termination date of March 2, 2003, for wrongful discharge in violation of public policy. Phaneuf, et al. v. United Parcel Services, Inc et al, 2000 U.S. Dist. LEXIS 2777 * 8 (D. Mass. February 25, 2000) ("it violates Massachusetts public policy to terminate an at-will employee for refusing to lie"), citing DeRose v. Putnam Management Co., 398 Mass. 205 (1986); Upton v. JWP Businessland, 425 Mass. 756, 758 (1997)

Cliveden's affidavit and detailed expenses and salary summaries (showing payments invoiced, paid and unpaid) show $167,530.42 in expenses due and at least $196,000 in unpaid salary as of March 2, 2003. These unpaid expenses and salary date back to December 2001, and thus, as of this date, three years worth of prejudgment interest has accrued. By the time judgment enters, the judgment, interest and costs (including the costs of service of process upon foreign defendants and discovery related costs) will total $400,000 or more. Beyond that, Cliveden, who, in the absence of a contract was an employee at will, is likely to recover additional damages, as it is clear from the timing of his termination and the threats that preceded it, that Heina terminated his employment in response to Cliveden's support of a fellow employee's claim for unpaid wages (a claim that Heina eventually settled) and to Cliveden's refusal to utter false testimony.

B.  The Harm to Cliveden Outweighs the Harm to Defendants

It is reasonably likely – in fact substantially likely -- that Cliveden will prevail on the merits of his claim, however his work for the TEAMworks group of companies is characterized. Although a finding of irreparable harm does not appear to be part of the showing of a

17

preliminary injunction in aid of a reach-and-apply attachment, there is no question that, if the standard does apply, the harm to Cliveden without the issuance of prejudgment relief is irreparable. TEAMworks' past financial difficulties, the multitude of TEAMworks entities worldwide enabling the named defendants to put assets out of Cliveden's reach, and the difficulty, even impossibility of chasing defendants around the world to collect, require a preliminary injunction to prevent irreparable harm. See., Boston Athletic Association v. International Marathons, et al, 392 Mass. 356 (1984) (lack of funds to eventually satisfy a judgment is a sufficient basis for an injunction.). Given the magnitude of the Merck contract, the harm to Heina and the other TEAMworks entities of holding back $400,000 is minimal when balanced against the harm to Cliveden of never being able to collect on a judgment in his favor.

## CONCLUSION

For all of the foregoing reasons and to prevent manifest injustice, the preliminary injunction should be granted.

J.P. BRENTWOOD CLIVEDEN
By his attorneys,

*/s/ Jessica Block*
Jessica Block
BBO#046110
Block & Roos, LLP
60 State Street, 38th Floor
Boston, Massachusetts 02109
(617) 223-1900

Date: January 5, 2005

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on 1/5/05

*/s/ Jessica Block*

18