UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 JAN 27  P 4: 44

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| J.P. BRENTWOOD CLIVEDEN,<br><br>      Plaintiff,<br><br>v.<br><br>CDM CLINICAL DATA MANAGEMENT DEUTSCHLAND GMBH f/k/a TEAMWORKS COMMUNICATION SYSTEMS GMBH, CDM CLINICAL DATA MANAGEMENT UK LTD. f/k/a TEAMWORKS CLINICAL SERVICES LTD., TEAMWORKS CLINICAL SOLUTIONS LTD., TEAMWORKS CLINICAL SERVICES, INC., TEAMWORKS CLINICAL SOLUTIONS INTERNATIONAL, INC., TEAMWORKS CLINICAL SOLUTIONS PRIVATE LTD. and DR. THOMAS HEINA,<br><br>      Defendants,<br><br>and<br><br>MERCK & CO., INC.,<br><br>      Reach and Apply Defendant. | Civil Action No.  04-11903-JLT |

## SECOND AFFIDAVIT OF THOMAS HEINA

I, Dr. Thomas Heina, on oath hereby do depose and state that the following is true:

1.  I make this affidavit on behalf of myself and on behalf of each of the corporations which have been named as a defendant[1] in the above captioned matter, including: TEAMworks Clinical Services, Inc. and TEAMworks Clinical Solutions International, Inc., CDM Clinical Data Management Deutschland GmbH f/k/a TEAMworks Communications Systems GmbH (the

---

[1]    Three of the Defendants identified in this Affidavit, CDM Clinical Data Management UK Ltd., TEAMworks Clinical Solutions Ltd. and TEAMworks Clinical Solutions Private Ltd., have submitted a Motion to Dismiss for Lack of Personal Jurisdiction in this case, which as the date this Affidavit is made, is pending before the Court. The inclusion of these defendants in this Affidavit is not an acceptance of jurisdiction or a waiver of the defense of lack of personal jurisdiction. Rather, they are included in this Affidavit for the convenience of the Court. The Defendants reserve all of their rights regarding these defenses and the motion.

"GmbH"), CDM Clinical Data Management UK Ltd. ("CDM UK"), TEAMworks Clinical

Solutions Ltd. ("TEAMworks UK"), and TEAMworks Clinical Solutions Private Ltd.

("TEAMworks Singapore") (collectively, "Defendants").

      2.      I am a German citizen and have had limited business experience in the United

States.

      3.      I offer this Affidavit in support of Defendants' Motion to Dismiss for Lack of

Personal Jurisdiction and in support of Defendants' Opposition to Plaintiff's Motion for

Preliminary Injunction in Aid of Reach and Apply Attachment. The legal memoranda and

affidavits submitted by Mr. Cliveden contain numerous inaccuracies and falsehoods. While I

cannot respond to every issue raised by Mr. Cliveden and those who have submitted affidavits on

his behalf, in this Affidavit I address a few critical issues which go to the heart of Plaintiff's

claims:

      (a)      First, it simply is not true, as Mr. Cliveden asserts, that all the Defendants (and their

affiliates) should be regarded as a single corporate entity. As the facts described below

demonstrate, each company is a legally separate corporation established for a wholly legitimate

business purpose. Given that each entity has fully complied with the required corporate formalities

and applicable legal requirements, there is no basis for Mr. Cliveden's assertion that the corporate

form should be disregarded.

      (b)      Second, it simply is not true that any of the Defendants (or their affiliates) was

established to evade creditors or avoid legal liabilities. Through his briefs and affidavits, Mr.

Cliveden attempts to create the impression that numerous employees and contractors have left the

companies they worked for without the pay owed to them. This is not true. Again, as set forth in

2

greater detail below and as the affidavits submitted on Mr. Cliveden's behalf make clear, I expressly confirm that all employees and contractors have been paid all sums owed to them.

    (c)    Third, it simply is not true that "numerous" suits have been filed against me personally or against any of the Defendants or their affiliates. Mr. Cliveden misleadingly suggests that many employees, contractors, vendors, suppliers and others have been forced to sue to collect sums owed to them. Again, these allegations are patently false. Other than Mr. Cliveden, two individuals have left a company claiming they were owed compensation, and initiated legal action on their claims. Each case resulted from a legitimate dispute by the company involved, and was addressed in a direct and timely way. Both cases reached reasonable settlements early in the proceedings (one, within approximately three months of the initial demand). In short, contrary to Mr. Cliveden's suggestion, there was no attempt by me, or any of the corporate defendants, to evade payment of any amount earned and owed.

**Background Regarding Plaintiff J.P. Brentwood Cliveden**

    4.    TEAMworks Communications Systems Deutschland, GmbH, now known as CDM Clinical Data Management Deutschland GmbH (the "GmbH") engaged Mr. Cliveden as an independent contractor in approximately August 2000. The events leading to his engagement are not complicated. Although Mr. Cliveden and I initially discussed an employment relationship through which he would have been employed by TEAMworks Information Systems, Inc. (which recently had been incorporated in California), we did not agree on the terms and conditions of such a relationship.

    5.    In or about July 2000, I sent Mr. Cliveden a draft employment agreement, which, although not final, set out most of the terms of the contemplated employment relationship. The draft agreement was never put into final form or executed and, moreover, Mr. Cliveden did not

accept or agree to these terms. To the contrary, he sent me an email on July 12, 2000 identifying a number of disagreements he had with the proposed terms. See Exhibit A. We never did reach an agreement, and no contract was ever signed. Indeed, I explicitly noted in an email to him that he had attempted to include terms that had not been agreed upon, and that this was unacceptable. See Exhibit B.

6.      At that time, there was not enough work and infrastructure in the U.S. to justify hiring a full time employee in a high profile position. Hence, in August 2000, during a phone conversation, I formally offered Mr. Cliveden a position as an independent contractor of the GmbH, which he accepted.

7.      During this conversation, Mr. Cliveden agreed to work as an independent contractor until there was enough business in the U.S. to support a full time employment position, at which time we would again discuss the possible terms of an employment relationship. I told Mr. Cliveden that his work as a contractor would include business development, and that he would work as an independent contractor. Mr. Cliveden indicated that he understood and agreed to these terms.

8.      As an independent contractor, Mr. Cliveden was retained by, and worked exclusively for, the GmbH. He was always paid by the GmbH.[2] Although I dispute that Mr. Cliveden submitted most of the expense requests he now claims to have provided,[3] to the extent he submitted any expense requests, they were to be sent to the GmbH's offices in Germany.

---

[2]      On one occasion, Mr. Cliveden was paid by CDM UK (which at the time was known as TEAMworks Clinical Services, Ltd.). This payment was made as a one time administrative convenience (to accommodate Mr. Cliveden) and was fully documented as an inter-company loan which was properly recorded on both companies' books and which was repaid. In no way was CDM UK ever intended to be, nor was it, an employer or user of Mr. Cliveden's services.

[3]      In paragraph 13 of Mr. Cliveden's Affidavit in Support of his Application for Preliminary Injunction, he states that he "*submitted* 269 expense reports" and that "I *have*" receipts to back up the reports. (Emphasis added). A close reading of this artfully worded statement reveals that the back up receipts were never actually *submitted*, as

4

9.      With regard to Mr. Cliveden's claimed expenses, I note that on numerous occasions, both verbally and via email (see, for example, Exhibit C), the GmbH asked him to submit documentation supporting the amount claimed. To my knowledge, he never did so.

10.     Similarly, with regard to Mr. Cliveden's claims for $14,000 a month "salary," he understood that, as an independent contractor, his pay was contingent on the work he performed. On several occasions I asked him, both verbally and in emails, to submit summary break downs of the work he claimed to be performing, but he never did so. During 2002 in particular, Mr. Cliveden produced few, if any, of the deliverables that he and I discussed and that Mr. Cliveden offered and promised to deliver.

11.     Although Mr. Cliveden frequently referred to his pay as "salary" I (mistakenly) understood this to be American shorthand for "pay" or "compensation," applicable to both employees and contractors, and thus I did not correct him. It is my experience in Germany and in other countries that the word "salary" can refer to payment to someone who provides services, including contractors.

12.     Mr. Cliveden's name and work address did appear on a number of contact lists. I point out that most of these lists include all individuals working for the TEAMworks family of companies, including both employees and contractors. See, e.g., Exhibit D. The contact list was created soon after Mr. Cliveden was engaged and does not list a title for him. Later, a secretarial level employee asked everyone to update their contact information. See Exhibit E. Mr. Cliveden supplied the "Vice President and General Manager, North America" title, without authorization from any management personnel of the GmbH or other company.

---

required, and as the GmbH repeatedly requested in order to process payment of the claimed amounts and to comply with its accountant's instructions for proper expense documentation.

13.    In June 2003, Mr. Cliveden initiated a suit in the United Kingdom against

TEAMworks Clinical Services, Ltd. (now known as CDM Clinical Data Management UK Ltd.)

and other affiliated companies.  Mr. Cliveden, with full representation of counsel, litigated the

suit through discovery and to the eve of a potentially dispositive hearing, when, mysteriously, he

withdrew his suit entirely.  The U.K. tribunal found his actions so impertinent and irresponsible

that it awarded attorneys' fees to counsel for the Defendants.  See Exhibit F.

**Background on the Companies Named as Defendants**

14.    The Defendant corporations operate in the biotechnology field, providing highly

specialized software, along with technological and clinical support, to aid in the process of testing

and bringing new pharmaceutical products, such as new drugs or medical devices, to market.

15.    Each of the Defendants is a start-up company, some of which were launched in the

late 1990s during the tech boom.

16.    Mr. Cliveden began performing services as an independent contractor for the

GmbH in August 2000, around the time that the economic climate began to change.  Not

surprisingly, at that time, the GmbH and the other companies began to experience some periodic

financial difficulties.  In addition to the fact that the capital market for biotechnology changed

dramatically, the GmbH also experienced difficulty securing payment from an important customer.

As a result, from time-to-time, some employees, including me, as well as contractors and vendors,

were paid late.  When there was a cash flow problem, every effort was made to obtain funds to pay

employees and contractors as soon as possible.

17.    Despite these intermittent cash flow issues, all current and former employees and

contractors, as well as vendors, have been paid all sums owed to them.

18.     I note in particular that all of the individuals who have submitted affidavits on Mr. Cliveden's behalf acknowledge that they have been fully paid. Although in some cases the amount that certain individuals claimed was disputed, in the end, a reasonable agreement was reached and all sums were paid.

19.     Mr. Cliveden, and others who have submitted affidavits on his behalf, greatly exaggerate -- or simply lie -- about the number of lawsuits against the various corporations. In point of fact, only three individuals initiated legal action against the companies they worked for, claiming that they were owed compensation at the time of their termination or disengagement: Bruce Sharp, Lance Eminger and Mr. Cliveden. Mr. Eminger's claims were settled within weeks of the time he made his demand. Mr. Sharp also settled his claims, notably after several notices from the German tribunal indicating that the evidence he had presented was wholly inadequate and that a finding against him was imminent (see paragraph 37, below.)

20.     The allegation that other contractors, vendors, suppliers or service providers have initiated any form of legal action against any of the Defendants is absolutely false.

21.     Mr. Cliveden, and those who have submitted affidavits on his behalf, make numerous statements which are inaccurate, misleading or outright falsehoods. Without responding to each and every allegation (although I reserve the right to do so at a later time), I am compelled to provide the following information about individual biases and egregious misstatements:

**Response to the Affidavits of Lance Eminger**

22.     Upon information and belief, Mr. Eminger now works for a competitor, which I believe motivated him to submit his affidavit.

23.     While employed by TEAMworks Clinical Services Pte., Ltd., and TEAMworks Information Systems Pte., Ltd. (companies that are not defendants in this matter), Mr. Eminger was

responsible for all company finances, including payments to all employees, including himself. Thus, it was Mr. Eminger's job to make these payments (or, at a minimum, to record debts for these payments on the companies' books). By his own admission, he failed to do so.

24.    Beyond failing to fulfill his financial duties, as a company director in charge of the Singapore office, Mr. Eminger was lackadaisical, unprofessional and exercised poor business judgment. He and other employees did minimal amounts of work and Mr. Eminger repeatedly committed the company to intensive, time consuming and unprofitable projects. Not surprisingly, Mr. Eminger was unhappy when the company made a management change, bringing Ms. Anna Higgins in to oversee his work, and when I later relocated to Singapore myself. Mr. Eminger bridled when the contracts he had entered were reviewed and errors were found, when work hours increased and standards of professionalism were raised, and when his decision-making and management style was critiqued.

25.    At the time of his separation, Mr. Eminger claimed that the company owed him certain pension payments (notwithstanding the fact that he had been charged with ensuring that such payments were made). Within about three months of the time he initiated legal action, all issues were settled and Mr. Eminger was fully paid -- facts that he admits in his Affidavit.

26.    Mr. Eminger's statement, contained in paragraph 5 of his Affidavit, that certain individuals are owed compensation is patently false.

**Response to the Affidavits of Anders Krogh**

27.    Upon information and belief, Anders Krogh now works for a competitor, which I believe motivated him to submit his affidavit.

28.    Mr. Krogh also worked for TEAMworks Information Systems Pte., Ltd. under the supervision of Mr. Eminger (again, this company is not a defendant in this case). Mr. Krogh

enjoyed the lax working environment perpetuated by Mr. Eminger, and was quite unhappy when management's expectations changed.

29.     Although Mr. Krogh, whose job entailed performance of a critical technical function, was well paid, he repeatedly demanded more money and bonus payments. Because his work was so important to the company, some of his demands were met and certain bonus payments were made. Mr. Krogh nonetheless failed to complete important aspects of the work he agreed to perform.

30.     During his employment, Mr. Krogh sought Singaporean residency status through the sponsorship of the company. In Singapore, such sponsorship entails significant burdens to the employer. Without proper authorization, Mr. Krogh prepared the necessary paperwork on his own behalf, falsely stating such sponsorship had been duly approved.

31.     Mr. Krogh quit his job approximately 10 weeks before the agreed upon date, did not perform the necessary and agreed upon transition to other members of staff (for which the company already had paid him a "bonus in advance") and failed to attend a critical meeting with an important client, resulting in significant harm to the client and to the company.

**Response to the Affidavit of Roger Holden**

32.     Mr. Holden makes several statements in his affidavit that are not true. Without addressing each one, I note in particular that no companies or individuals have initiated suit against any of the Defendants for payment for materials or services, as Mr. Holden alleges in paragraph 8 of his Affidavit.

33.     Further, in his role as head of quality assurance, Mr. Holden was well aware of and understood that each corporation was a separate entity, and that each had different corporate registration numbers, letterheads, VAT numbers, etc.

**Response to the Affidavit of Douglas Bain**

34.    Upon information and belief, Mr. Bain now works for a competitor, which I believe motivated him to submit his Affidavit.

35.    Mr. Bain's employment with TEAMworks Clinical Services Ltd. was terminated after I received information strongly suggesting that he was involved in activities in regard to providing misinformation to a venture capital group which undermined the company's chances of receiving funding.

**Response to the Affidavit of Douglas Beauregard**

36.    Like all the others who have submitted affidavits in this matter, Mr. Beauregard admits that he was fully paid.  I note, however, that contrary to paragraph 3 of his Affidavit, the payments he received had nothing whatsoever to do with his particular involvement with Zymogenetics, but were based on the fact that Mr. Beauregard delivered his work in a reliable and professional way and in line with mutually agreed upon expectations.

**Response to the Affidavit of Bruce Sharp**

37.    Bruce Sharp was a contractor of the GmbH.  Mr. Sharp did file a lawsuit in Germany, initially claiming that he was a contractor.  After receiving a notice from the tribunal that the evidence he submitted was insufficient to establish his claims, however, he instead then claimed to be an employee.  After several machinations, the tribunal again informed Mr. Sharp that his evidence was insufficient.  See Exhibit G.  At that point, confronted with nearly assured loss in court, Mr. Sharp agreed to settle his claims.

**Response to the Affidavit of Jeremy Smethurst**

38.    Upon information and belief, Jeremy Smethurst now works for a competitor, which I believe motivated him to submit his affidavit.

10

39.     Contrary to the implication of paragraph 3 of Mr. Smethurt's Affidavit, all amounts, including pension contributions, were paid.

40.     Mr. Smethurst failed in basic aspects of his job, including business development and sales. He also demonstrated poor judgment, mismanaging projects and repeatedly incurring losses.

**Response to the Affidavit of Victoria Wills**

41.     Victoria Wills correctly admits that she was fully paid at that time she voluntarily resigned.

**The Corporate Structure of the Defendant Companies**

42.     Contrary to the allegations contained in Mr. Cliveden's affidavits, the Complaint and his briefs in this matter, the corporate entities named in this lawsuit (and their affiliates) were most definitively not created by me "to escape liability to employees and vendors to whom money is owed by the existing companies."[4/] In fact, each of the companies was created in accordance with the applicable law of the country in which it was incorporated for a specific business purpose, as described below.

43.     By way of background, I note that two of the companies named as Defendants -- TEAMworks Communication Systems GmbH and CDM Clinical Data Management UK, Ltd. -- have changed names. Both Companies are currently owned by my wife, Martina Heina. In November 2002, due to professional and personal differences, Martina and I decided to part ways. We are in the process of an amicable divorce.

44.     Martina and I agreed that I would establish entirely new companies. Thus, TEAMworks Communication Systems GmbH and TEAMworks Clinical Services, Ltd. were

---

[4/]     Opposition of J.P. Brentwood Cliveden to the Motion to Dismiss of CDM Clinical Data Management UK., Ltd., TEAMworks Clinical Solutions, Ltd., and TEAMworks Clinical Solutions, Pte., Ltd.

renamed, respectively, CDM Clinical Data Management Deutschland, GmbH and CDM Clinical

Data Management UK, Ltd., to differentiate them from the newly created entities with the

"TEAMworks" name.  The new entities are separate and wholly independent corporations.

45.    Each of the Defendants named in this lawsuit has separate offices, phone

numbers, fax numbers, letterheads, and business cards.

46.    Each of the Defendant corporations (and their affiliates) was established for a

specific -- and entirely legitimate -- business purpose.  The TEAMworks family of companies is

a start-up poised for growth in a highly competitive global market.

47.    The products and services the companies provide are marketed and sold to

customers in a spectrum of fields (including hospitals, laboratories, biotechnology companies

and pharmaceutical companies) which are based all over the world.  In order to meet the needs of

current -- and sometimes, potential -- customers, local infrastructure is necessary.

48.    In some cases, a corporation was created as the result of a business opportunity or

to hire an individual with unique and specialized skills.  Some companies, for example, were

created as the result of a merger or acquisition of another company.  Others were set up to

capitalize on favorable business conditions, such as the availability of skilled individuals, the

growth of biotech or pharmaceutical companies, or other factors such as tax laws.

49.    Each Defendant has it own letterhead, which includes the names of its directors,

its address, and phone and fax numbers. Each Defendant also has its own business cards.  When

a representative of a certain Defendant is transacting business with another entity, the

representative uses only the letterhead and business cards that correspond to the Defendant

company which he or she is representing.

50.    Notably, Mr. Cliveden created and used a new letterhead template with the name "TEAMworks," but identifying a company that did not exist, and did so without authorization. He did this by directing a secretarial level employee to set up a new letterhead template, the content of which he supplied. See Exhibit H. Although he was never given authorization for this, I believe he used this letterhead.

51.    Similarly, Mr. Cliveden ordered and used business cards with the title "Director, U.S. Operations," supposedly with TEAMworks Information Systems Inc., Mountain View, California (a company which is not a defendant), and at a later stage seemed to have changed the title on the business card to "Vice President and General Manager, North America," supposedly then with TEAMworks Information Systems Inc., Boston, Massachusetts (a company he knew never existed). In both cases, he took such actions without authorization.

52.    Each of the Defendants observes proper corporate formalities. For instance:

(a)    Each Defendant has a distinct and separate Board of Directors.

(b)    Each Defendant conducts its own, separate meetings of its Board of Directors.

(c)    Each Defendant conducts its own, separate Annual Meeting.

53.    Although I am a member of the board of directors of each of the Defendant corporations, the day-to-day operational decisions of most Defendants are made by that Defendant's separate group of managers and corporate officers. For instance, for TEAMworks Clinical Solutions Ltd. (UK), the decision-maker is Mr. John Higgins; for CDM Deutschland GmbH (formerly TEAMworks Communications Systems GmbH), the decision-maker is Martina Heina; for TEAMworks Clinical Solutions Pte Ltd. (Singapore), the decision-maker is Anna Higgins.

13

54.     None of the management-level employees of one Defendant are employees of another Defendant.

55.     Each Defendant, at all times, has been sufficiently capitalized for its specific corporate endeavors.

56.     Each Defendant files its own, separate tax returns.

57.     Each Defendant maintains its own, separate financial records.

58.     Each Defendant maintains its own, separate financial accounts.

59.     Each Defendant maintains its own, separate assets.

60.     Every financial transaction between the Defendants is properly recorded in the relevant Defendants' financial records.

61.     On limited occasions, one Defendant company may loan money to another. All money loaned by one company to another is done so pursuant to a formally executed loan agreement, and is properly recorded as an interest-bearing loan in the relevant Defendants' financial records.

62.     If a Defendant is late in any form of payment to another Defendant, the Defendant to whom the payment is owed charges the other Defendant interest on such payment.

63.     An entity transacting business with a Defendant will deal directly with that Defendant. The specific Defendant involved in the transaction will make any required payments to that entity. Payment will not be made by any other Defendant.

64.     I am not aware of any occasion on which a person or entity was confused as to the identity of a specific Defendant. Nor am I aware of any occasion on which any confusion resulted in any harm, financial or otherwise, to a person or entity.

65.    Whenever I have transacted business with other entities, I always have clearly indicated the specific name of the Defendant that I was representing.

66.    Mr. Cliveden never indicated to me, in any form or fashion, that he was confused about which Defendant company I was representing when I interacted with him on business matters.

67.    I believe that Mr. Cliveden fully understood that he was engaged as an independent contractor for the GmbH.

68.    Mr. Cliveden never indicated to me, in any form or fashion, that he was confused about which company he was providing services to as an independent contractor.

69.    Mr. Cliveden never indicated to me, in any form or fashion, that he felt that the existence of the Defendants other than the GmbH was in any way unfair or confusing to him.

70.    The contract which Plaintiff seeks to reach and apply is between TEAMworks Clinical Solutions, Inc. (a Delaware company) and Merck & Co. -- two corporations with primary places of business in New Jersey. This contract has been performed entirely in New Jersey and all payments under it have been made by Merck & Co. (in New Jersey) to TEAMworks Clinical Solutions, Inc. (in New Jersey). No aspect of this contract has ever been performed in Massachusetts, and no contract payments have ever been made by or to any entity in Massachusetts.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY this 25th day of January, 2005.

_____

Dr. Thomas Heina