UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 FEB -9 P 4: 42

U.S. DISTRICT COURT
DISTRICT OF MASS.

J. P. BRENTWOOD CLIVEDEN

    Plaintiff

v.

CDM CLINICAL DATA MANAGEMENT
DEUTSCHLAND GmbH f/k/a/ TEAMWORKS
COMMUNICATION SYSTEMS GmbH,
CDM CLINICAL DATA MANAGEMENT UK LTD,
f/k/a TEAMWORKS CLINICAL SERVICES LTD.,
TEAMWORKS CLINICAL SOLUTIONS, LTD,
TEAMWORKS CLINICAL SERVICES, INC.,
TEAMWORKS CLINICAL SOLUTIONS
INTERNATIONAL, INC., TEAMWORKS CLINICAL
SOLUTIONS PRIVATE LTD, and DR. THOMAS
HEINA,

    Defendants.

and

MERCK & CO., IN,

    Reach and Apply Defendant.

CIVIL ACTION NO.  04 11903 JLT

**REPLY MEMORANDUM OF J. P. BRENTWOOD CLIVEDEN IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION**

Plaintiff J.P. BRENTWOOD CLIVEDEN ("Cliveden") submits this Reply Memorandum to rebut both the factual and legal contentions raised in opposition to his Application for a Preliminary Injunction in Aid of a Reach and Apply Attachment. Additionally, since Cliveden originally filed his application, defendants finally produced the Merck contract to Cliveden. Cliveden will address the effect of the contract's terms as to his application for a preliminary

injunction. It appears that the contract is between TEAMworks Clinical Services Inc. and Merck & Co., both of whom have submitted to the jurisdiction of this Court.[1]

Although there is contrary authority as to the standards to be applied in connection with a preliminary injunction in aid of a reach and apply attachment, Cliveden will assume for the purposes of this motion that traditional preliminary injunction standards apply. That is, the moving party must demonstrate the probability of success on the merits, the prospect of irreparable harm absent the injunction as contrasted with the hardship to the nonmovant if the injunction is issued and, if applicable, the effect of the court's action on the public interest. Dorcas Rosario-Urdaz v. Victor Rivera-Hernandez et al, 350 F. 3d 219 (1st Cir. 2003) (citations omitted). As set forth below, Cliveden has more than met these standards.

### A.  There is a Substantial Likelihood that Cliveden Will Recover Judgment, Including interest and Costs, in Excess of $400,000. the Amount Cliveden Asks This Court to Preliminary Enjoin Merck From Remitting to TEAMworks

The evidence submitted by Cliveden in (1) his first affidavit in support of his application for a preliminary injunction ("Cliveden First Affidavit"), (2) his second affidavit submitted herewith ("Cliveden Second Affidavit"), (3) the second affidavit of Bruce Sharp ("Sharp Second Affidavit") also submitted herewith, (3) the previously submitted affidavits of Lance Eminger, Douglas Bain, Douglas Beauregard, Victoria Wells, Anders Krogh, Bruce Sharp, Roger Holden and Jeremy Smethurst establish overwhelmingly that in August 2000 Heina hired Cliveden, as an employee, at a monthly salary and reimbursement of expenses, to work for the TEAMworks group of companies to direct their US operations.. The testamentary and documentary evidence submitted by Cliveden establishes a series of conversations and e-mail correspondence in 2000

---

[1] The parties entered into a protective order. Prior to the hearing, Cliveden will move for a protective order so as to be able to present the contract for the Court's review only.

2

in which Heina agreed that until a company was formally incorporated in Boston,[2] which he represented he would do promptly, he would employ Cliveden to work for TEAMworks and Cliveden's salary as an employee would consist of $160,000 annually payable monthly, reimbursement of the employer's share of Social Security, reimbursement of the cost of purchasing life, health and disability insurance policies and a pension plan equivalent. (Cliveden Second Affidavit, ¶4). TEAMworks did, in fact, make such payments through December, 2001. The last payment was made in May, 2002 for work performed through December 2001. (See Cliveden First Affidavit, ¶17; Cliveden Second Affidavit, Exhibit ¶ 4 and Exhibit 4). A formal contract for Cliveden in compliance with US law, in fact, was prepared by Mintz, Levin for Cliveden to sign, but Heina never furnished it to Cliveden. (Cliveden Second Affidavit, Exhibit 7).[3] Instead the parties continued their at-will relationship as formed in August 2000, an employment relationship that Heina verified would last a "long time." (Cliveden First Affidavit, ¶17 and Exhibit L). Heina did not terminate that relationship or change it at any time. On March 2, 2003, he purported to terminate Cliveden's employment in retaliation for his testimony in support of another employee's wage claim and subsequent refusal to swear out false testimony. (Cliveden First Affidavit, ¶21 and Exhibits P through S).

If there is any doubt as to the parties' agreement made in August 2000, Cliveden has submitted an e-mail from Heina in the one instance in which he itemized one of his wire transfers to Cliveden. His e-mail shows that, as agreed in August, 2000, Heina paid life insurance, disability insurance, expenses, social security, a salary payment and other expense

---

[2] Heina offered employment to other employees in a similar fashion, representing, as he did to Cliveden, that they would receive more formal contracts after a "small interim period" when "we got the lawyers going." Cliveden Second Aff. ¶8 and Exhibit 8. They never did receive such contracts.

[3] In an e-mail dated March 15, 2002, Rob Duggan of Mintz Levin, having prepared a draft agreement asked Cliveden, "How about your employment agreement and the templates?" The only reason no agreement was signed was because Heina withheld the draft from Cliveden.

reimbursements consistent with draft employment agreement and follow up conversations. Otherwise, Heina simply wired money in response to expense reports submitted by Cliveden, showing payment of "salary" at the rate of $14,000/month and reimbursement of expenses, including the insurance, disability payments, social security payments and other expenses incurred by Cliveden. (Cliveden Second Affidavit, ¶ 4 and Exhibit 4.)   Nowhere is there any evidence that these payments were linked to a "deliverable" requirement as the notations all refer to a "salary", usually denoting the month, of $14,000/month and "expenses." It simply is not credible that Heina would pay the employer share of Social Security reimbursement, life insurance, pension plan equivalent, disability insurance reimbursement and the like to an independent contractor as all of these benefits all are indicia of an employer-employee relationship.  Heina's assertion now that he did not understand the word "salary" to be a payment to an employee is as absurd as his contention in Bruce Sharp's case that he did not understand English!  Heina's contention that he has "limited" experience in the U.S. is equally not credible, as he did business, among other companies, with Bayer, Eli Lily, Wyeth Ayerst, Genzyme, Zymogenetics, Roche, Novartis, J&J and perhaps others of which Cliveden is not aware. (Cliveden Second Affidavit, ¶6). As the Court can see, the extensive correspondence was all in English.

  As to Heina's claim that Cliveden gave himself an unauthorized title of Vice President, Cliveden was identified as such by literature created and distributed by the company in the United Kingdom. (Cliveden Second Affidavit, ¶6 and Exhibit 6.) Indeed Heina's lawyers, who now advocate the opposite position, referred to Cliveden as a Vice President in bills sent to him in that capacity, which Cliveden then sent along to Heina for payment. (Id and Exhibit 7). Other former employees previously submitted affidavits attesting that Heina referred to Cliveden

as a Vice President in introductions to clients and outside vendors. (Bain Aff., ¶2; Beauregard Aff, ¶2; Krogh, ¶2; Sharp Aff., ¶2; Smethurst Aff., ¶5; Wills, Aff., ¶2)[1]  And, on January 22, 2001 Heina signed an employer verification noting that Cliveden's employment terms was "long time" and that his title was "Vice President of US operations," further contradicting his statement in January 2005 that such a title was "unauthorized." Cliveden used the company name TEAMworks Information Systems, as that was the company name on the original draft employment agreement prepared by Heina. (Cliveden Second Affidavit, ¶7).  In any event, this issue is a red herring because the fact remains that Heina agreed to pay and did pay until he unilaterally refused to honor his obligations, $14,000 monthly in salary and expenses incurred by Cliveden solely on the company's behalf.

Heina, who provided the only sworn testimony in opposition to Cliveden's application for injunctive relief, has not produced a single document out of several thousand already produced to show that, in 2000, he employed Cliveden only on the condition that he provide a list of "deliverables" (whatever Heina means by that term).   The only evidence proffered by defendants to refute Cliveden's testimony as to the terms of the employment relationship in 2000 is an e-mail, dated August 3, 2000, sent at 4:27 AM by Heina, noting some potential disagreements about the terms of the employment, which, Heina hoped, would not create an obstacle to finalizing the deal. They did not. Cliveden has submitted evidence that at 12:35 PM that same day, he and Heina had a conversation ironing out the final details (Cliveden Second Affidavit, Exhibit 2) and that, by 5:39 PM that evening, he and Heina had agreed to the terms such that Heina was asking for his address for inclusion in the employment contract. (Cliveden Second Affidavit, ¶4 and Exhibit 3).  As to the belated claim that Cliveden's salary was dependent upon Cliveden producing a list of "deliverables," in the 50 documents produced by

defendants in Automatic Disclosure and the over 3000 documents produced by Cliveden, the first time a "deliverable" requirement appears is on January 6, 2003, two and a half years after Cliveden commenced employment with the TEAMworks group of companies and after voluminous correspondence between the two in which no such requirement was never even mentioned. It was by January 2003 that Heina learned Cliveden had supported Bruce Sharp in his lawsuit to recover his salary and expenses (*See* Sharp Second Affidavit, Exhibit 6). As Bruce Sharp has confirmed, Heina raised identical arguments in his case despite the unequivocal evidence of employment, promises of payment and lack of any demand for "deliverables" until after Sharp's employment was terminated. (Second Affidavit of Bruce Sharp and Exhibits 1 through 6). And Heina has offered no excuse, because there is none, as to why he has not reimbursed Cliveden for nearly $130,000 of expenses such as the expenses of office headquarters, telecommunications, travel expenses for trips made solely to benefit the TEAMworks group of companies (which were all arranged through TEAMworks staff), supplies, hardware and related business expenses.

    Cliveden also has submitted evidence to this Court that in the two and a half years that he worked for TEAMworks, he sent timely, detailed expenses reports on a monthly basis and had available substantial documentation, all of which has been produced to defendants and samples of which have been produced to this Court. These expenses reports – 259 of them – are too voluminous to append to an affidavit, but included the expenses of running the headquarters, phone and other telecommunications bills, travel expenses incurred solely for the benefit of TEAMworks, etc. All of these items were timely submitted and described to Heina and his wife Martina, all without protest from either of them and, indeed, with repeated promises of payment as soon as TEAMworks received payments from one customer or the other. (Cliveden Second

Affidavit, ¶¶9 and Exhibits 9, 10 and 11). In the voluminous documentation furnished to defendants by Cliveden, Heina's one comment about the expenses reports (prior to his retaliation for Cliveden's support of Sharp) was that he had lost them -- only to recover them shortly thereafter.(Cliveden Second Affidavit, ¶9 and Exhibit 9.)

If Heina believed at any time that a list of deliverables was required he never mentioned that requirement to Cliveden. Heina received all of Cliveden's correspondence about the financial hardship the continued delays in payment and the non-payment were causing. Rather than demanding "deliverables" he promised to remedy the situation and acknowledged Cliveden's contribution to the company. (Cliveden Second Affidavit, ¶ 11 and Exhibit 11). Cliveden has annexed to his affidavit numerous e-mails and phone logs showing Heina's repeated promises to pay outstanding salary and expenses from Genzyme payments to TEAMworks and even to arrange for the transfer of those payments to Cliveden. (Cliveden Second Affidavit, ¶10 and Exhibit 10).

In light of the substantial documentation of Cliveden's position that he was employed at a $14,000/month salary from August 2000 though March 2, 2003, when Heina terminated his employment in retaliation for his support of Bruce Sharp, the overwhelming supporting evidence by eight other employees at TEAMworks of Cliveden's employment relationship and contribution to the TEAMworks entities and the flimsy self-serving evidence proffered by the defendants that is contradicted by Heina's own words and conduct, Cliveden has a substantial probability of proving TEAMworks' debt to him at trial.[4] The mathematical calculation is not difficult. Cliveden has submitted to this Court (and the numbers have not been challenged with

---

[4] Defendants' lame assertions that the order in the UK tribunal proves Cliveden's claims were frivolous are betrayed by the order itself, which shows that the sole reason for assessment of costs was insufficient notice of Cliveden's decision to withdraw the claim to pursue it here in the United States. There was no adjudication on the merits and therefore no collateral estoppel effect

7

any contrary evidence) a detailed expense summary (Cliveden First Affidavit, Exhibit H), backed up by 259 expense reports and receipts furnished to defendants, showing expenses of $167,530.42). At $14,000 month, the outstanding salary payments total $196,000 (Cliveden First Affidavit, Exhibit J.) When consequential damages in the form of lost interest on retirement benefits liquidated by Cliveden to pay living expenses and TEAMworks expenses are added (see attached Certification Under Local Rule 26.1 (B)(2)), and interest on even a judgment for the expenses and salary alone are considered, the damages exceed the $400,000 payment from Merck to TEAMworks Cliveden seeks to restrain through his application for a preliminary injunction. Cliveden also has a valid claim that he was terminated in violation of public policy for his testimony in support of another employee, and additional damages could be assessed.

Both Merck and TEAMworks Clinical Services Inc. have submitted to the personal jurisdiction of this Court. This Court can enter an order enjoining Merck from paying TEAMworks up to $400,000 under its Licensing Agreement pending litigation. The debt does not have to be reduced to judgment. Only plaintiffs in non-statutory equitable claims to reach and apply must be judgment creditors. Aylward v. Lawrence Sav. Bank (In re Osgood), 203 B. R. 865, 869 (Bankr. D. Mass. 1997). Cliveden is seeking a reach and apply attachment and a preliminary injunction in aid of that attachment under M.G.L. c. 214, ¶3(6), a statutory remedy available to non-judgment creditors such as Cliveden. See discussion in In re Osgood, 203 B.R. at 869-70. Where, as here, there is substantial evidence that the plaintiff will prevail in a contractual dispute, injunctive relief restraining the reach and apply defendant from paying the primary defendant is entirely appropriate. Qwest Communications Corp. v. Cyber Access Internet Communications, 2000 Mass. Super. LEXIS 556 (Middlesex Superior Court, December 18, 2000) (in a contract dispute, where billing records supported plaintiff's interpretation of the

contract amount owed, court ordered injunctive relief restraining six reach and apply defendants from paying any monies to the primary defendant). See also Rotondi v. Data Care Corporation, 14 Mass. L. Rep. 247, 2001 Mass. Super LEXIS 601 * 1 (Middlesex Superior Court, November 21, 2001) (law firm claiming consequential damages for breach of contract granted leave to amend its complaint to add reach and apply defendant and, upon execution of the contract between the primary defendant and the reach and apply defendant, a preliminary injunction mandating that $500,000 be placed in escrow pending litigation); Hiller Cranberry Products v. Koplovsky et al, 165 F. 3d 1 (1st Cir. 1999) (affirming district court's preliminary injunction against a reach-and-apply defendant from paying any amount due the primary defendant where defendant failed to pay $4.4 million for goods and services)

### Cliveden Will Be Irreparably Harmed Without the Injunction.

Cliveden has submitted extensive evidence that TEAMworks lives from one contract to the next, delaying payments to employees, creditors and vendors until payments come in. Although defendants argue they will pay a judgment, promises are nothing except as realized. Through his Second Affidavit, and through the affidavits of eight of TEAMworks former employers, Cliveden has shown that TEAMworks financial viability is only as good as its last contract. If it cannot even pay its own employees in a timely fashion, what incentive will there be for these foreign defendants to pay a U.S. judgment? Heina's Second Affidavit only demonstrates further the precarious financial circumstances of the various entities he has incorporated. There are many of them and clearly they are overextended. Now, apparently Heina is going through an "amicable" divorce and dividing ownership of the companies with his soon to be ex wife – thus raising the specter of fraudulent transfers in Europe and Asia and concerns about a US plaintiff's ability to reach assets.

Cliveden has shown how Heina promised payment to him and other employees out of monies to be received by J&J (but when Heina received only partial payment he asked Cliveden not to tell anyone who expected to be paid from the J & J funds), then by Novartis, and then by Genzyme, all the while pleading cash flow problems and, by his own admission, stringing out payments to employees and contractors. TEAMworks financial viability is only as good as its most recent contract. The Merck contract is, to Cliveden's knowledge the only contract now in the United States and Heina certainly has not produced any evidence in rebuttal (other than empty promises) that he or any of the TEAMworks entities have sufficient assets to satisfy a judgment. It is not clear from the Merck contract how much more time or money remains and Cliveden needs the security now lest all payments be made on the date of judgment. "Although equitable relief is usually not warranted in the face of an adequate remedy at law, the plaintiff also can show irreparable harm through the financially shaky defendant's inability of paying a future judgment." Rotondi v. Data Care Corporation, 2001 Mass. Super LEXIS 601 * 4, citing Hull Municipal Lighting Plant v. Mass. Municipal Wholesale Elec.Co., 399 Mass. 640, 644-5 (1987); Teradyne, Inc. v. Mostek, 797 F. 2d 43, 52-3 (1st Cir. 1986); Boston Athletic Assn v. International Marathons, Inc., 392 Mass. 356, 363 (1984).

### The Harm To Cliveden is Far Greater Than Any Harm to Defendants If the Injunction Issues

Without disclosing the full amount of the contract in a public filing, suffice it to say that the amount Cliveden seeks to restrain is but a small fraction of the overall Merck contract. On balance, the harm to Cliveden of having to chase the defendants around the world to collect on his judgment or to be a victim again of their lack of financial viability, far outweighs the harm to defendant of restraining a small portion of monies owed under the Merck contract. Although the

"public interest" element is not applicable here, it certainly can be argued that the public interest of this Court should be to protect American employees harmed by foreign employer's evasion of U.S. labor laws.

## CONCLUSION

For the reasons described in this Reply Memorandum as well as in Cliveden's original memorandum of law, the application for a preliminary injunction, restraining Merck from paying up to $400,000 to Heina or any of the TEAMworks related entities should be granted

J.P. BRENTWOOD CLIVEDEN<br>
By his attorneys,<br><br>
<em>[signature: Jessica Block]</em><br>
Jessica Block<br>
BBO#046110<br>
Block & Roos, LLP<br>
60 State Street, 38th Floor<br>
Boston, Massachusetts 02109

Date: February 9, 2005

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on 2/9/05

*[signature: Jessica Block]*